# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

<table>
<tr><td>US DOMINION, INC., DOMINION<br>VOTING SYSTEMS, INC., and<br>DOMINION VOTING SYSTEMS<br>CORPORATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>FOX NEWS NETWORK, LLC,<br><br>    Defendant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>C.A. No.: N21C-03-257 EMD</td></tr>
</table>

Submitted: September 27, 2021[1]
Decided: December 16, 2021

*Upon Defendant's Motion to Dismiss*
***DENIED***

Brian Farnan, Esquire, Michael J. Farnan, Esquire, Farnan LLP, Wilmington, Delaware; Rodney Smolla, Esquire, Wilmington, Delaware; Thomas A. Clare, Esquire, Megan L. Meier, Esquire, Dustin A. Pusch, Esquire, Daniel P. Watkins, Esquire, Clare Locke LLP, Alexandria, Virginia; Justin A. Nelson, Esquire, Susman Godfrey LLP, Houston, Texas; Stephen Shackelford, Jr., Esquire, Elisha Barron, Esquire, Susman Godfrey LLP, New York, New York; Davida Brook, Esquire, Emily Cronin, Esquire, Brittany Fowler, Esquire, Susman Godfrey LLP, Los Angeles, California; Stephen E. Morrissey, Esquire, Susman Godfrey LLP, Seattle, Washington; *Attorneys for Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.*

Blake Rohrbacher, Esquire, Katharine L. Mowery, Esquire, Valerie A. Caras, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Charles L. Babcock, Esquire, Jackson Walker LLP, Houston, Texas; Scott A. Keller, Esquire, Lehotsky Keller LLP, Washington, D.C; *Attorneys for Defendant Fox News Network, LLC.*

**DAVIS, J.**

---

[1] D.I. No. 103.

## I.    INTRODUCTION

This is a civil action involving a defamation claim.  Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively "Dominion") allege that Defendant Fox News Network, LLC ("Fox") published false and defamatory statements of fact about Dominion.  Through its complaint (the "Complaint"),[2] Dominion contends that: (i) Fox intentionally provided a platform for guests that Fox's hosts knew would make false and defamatory statements of fact on the air; (ii) Fox, through Fox's hosts, affirmed, endorsed, repeated, and agreed with those guests' statements; and (iii) Fox republished those defamatory and false statements of fact on the air, Fox's websites, Fox's social media accounts, and Fox's other digital platforms and subscription services.  Dominion seeks punitive and economic damages for defamation *per se*.

On May 18, 2021, Fox moved to dismiss (the "Motion") the Complaint for failure to state a claim.[3]  Dominion opposed the Motion, filing an answering brief on June 8, 2021.[4]  Fox filed its reply brief on June 25, 2021.[5]  The Court held a hearing on the Motion on August 30, 2021.[6] At the conclusion of the hearing, the Court took the Motion under advisement.  This is the Court's decision on the Motion.  For the reasons set forth below, the Motion is **DENIED**.

## II.    BACKGROUND

Unless otherwise indicated, the following facts are stated as alleged in the Complaint. For purposes of the Motion, the Court must view all well-pled facts alleged in the Complaint as true and in a light most favorable to Dominion.[7]  As such, the Court will not necessarily use

---

[2] D.I No. 1.
[3] D.I. No. 45.
[4] D.I. No. 60.
[5] D.I. No. 61
[6] D.I. No. 93.
[7] *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

terms like "alleged facts" or "purported facts" throughout. Unless otherwise indicated, all facts used herein come from the Complaint. This section tracks the facts in the order alleged in the Complaint.

## A. THE PARTIES

Plaintiff US Dominion, Inc. is a Delaware corporation with its principal place of business in Colorado.[8] Plaintiff Dominion Voting Systems, Inc. is a Delaware corporation with its principal place of business in Colorado.[9] Plaintiff Dominion Voting Systems Corporation is an Ontario corporation with its principal place of business in Ontario.[10] Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation are wholly owned subsidiaries of US Dominion, Inc.[11]

Defendant Fox is a Delaware LLC with its principal place of business in New York.[12] Fox operates the Fox news Channel, the Fox Business Channel, Fox News Radio, and Fox News Digital, which it refers to collectively as "Fox News Media."[13]

## B. RELEVANT NONPARTIES

Maria Bartiromo is a Fox News and Fox Business personality who hosts *Mornings with Maria* on Fox Business and *Sunday Morning Futures with Maria Bartiromo* on Fox News.[14] Ms. Bartiromo is Fox's agent.[15] Fox broadcasts *Mornings with Maria* and *Sunday Morning Futures* from New York.[16] Fox also controls Ms. Bartiromo's social media accounts.[17]

---

[8] Compl. ¶ 8.
[9] *Id.* ¶ 9.
[10] *Id.* ¶ 10.
[11] *Id.* ¶¶ 9, 10.
[12] *Id.* ¶ 11.
[13] *Id.*
[14] *Id.* ¶ 12.
[15] *Id.*
[16] *Id.*
[17] *Id.*

Tucker Carlson is a Fox News personality and hosts Fox's *Tucker Carlson Tonight*.[18] Mr. Carlson is Fox's agent.[19] Fox operates Mr. Carlson's Instagram account.[20]

Lou Dobbs is a Fox Business personality who hosted *Lou Dobbs Tonight*.[21] Until at least February 5, 2021, Fox operated Mr. Dobb's social media accounts.[22]

Sean Hannity is a Fox News personality and hosts Fox's *Hannity*.[23] Mr. Hannity is Fox's agent.[24]

Jeanine Pirro is a Fox News personality who hosts *Justice w/ Judge Jeanine*.[25] Ms. Pirro is Fox's agent.[26] Fox operates Ms. Pirro's social media accounts.[27]

Sidney Powell is an attorney that briefly pursued litigation challenging the 2020 Presidential Election.[28] Those cases were all summarily dismissed by December 9, 2020.[29] Fox repeatedly hosted Ms. Powell after the 2020 Presidential Election.[30]

Rudolph Giuliani, the former mayor of New York City, is a YouTube podcast host, radio show host and attorney to President Donald Trump and the Trump Campaign.[31] Fox repeatedly hosted Mr. Giuliani in the weeks following the 2020 Presidential Election.

---

[18] *Id.* ¶ 13.
[19] *Id.*
[20] *Id.*
[21] *Id.* ¶ 14.
[22] *Id.*
[23] *Id.* ¶ 15.
[24] *Id.*
[25] *Id.* ¶ 16.
[26] *Id.*
[27] *Id.*
[28] *Id.* ¶ 17.
[29] *Id.*
[30] *Id.*
[31] *Id.* ¶ 18.

Mike Lindell is the founder and CEO of My Pillow, Inc. ("MyPillow"), one of Fox's biggest sponsors.[32] Fox invited Mr. Lindell on *Tucker Carlson Tonight*, where he repeated lies about Dominion in response to questions about why he had been banned from Twitter.[33]

## C. DOMINION VOTING SYSTEMS

Dominion's voting systems are certified under U.S. Election Assistance Commission ("EAC") standards.[34] The EAC accredits independent testing laboratories that also review and test Dominion's voting systems.[35] In addition, Dominion designs its voting systems to be auditable.[36] Dominion's systems include paper ballot backup to verify results.[37]

Dominion contracts with state and local governments to provide voting systems services.[38] These contracts typically have multi-year terms and range in value from tens of thousands of dollars to over a hundred million dollars.[39] Dominion's contracts are historically long-term with high renewal rates.[40] In the 2020 election, Dominion provided voting machine technology in over 28 states including in more than 50 New York counties.[41]

## D. FOX ANTICIPATES SIGNIFICANT MAIL-IN VOTING DURING THE 2020 ELECTION.

Leading up to the 2020 election, Fox reported that election officials expected record mail-in voting because of coronavirus pandemic concerns.[42] Fox also reported that mail-in voting was widely expected to favor Democrats, in significant part because prominent Republicans,

---

[32] *Id.* ¶ 19.
[33] *Id.*
[34] *Id.* ¶ 21.
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.* ¶ 25.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* ¶ 29.

including former President Trump, consistently encouraged supporters to avoid voting by mail.[43] The Fox News Decision Desk head predicted that Fox would be unable to call some states where it seemed that former President Trump was in the lead because there would still be 20-30 percent of the vote outstanding.[44] The Desk head also recognized – and Fox reiterated before the election – that this would occur because former President Trump criticized mail-in voting while Democrats encouraged voting by mail.[45] Ms. Bartiromo discussed this with former President Trump in an October 11, 2020 interview.[46] Fox still spent considerable airtime before the election searching for and discussing voter fraud that might occur during the election.[47]

## E. FOX CONNECTS DOMINION TO THE FALSE ELECTION FRAUD NARRATIVE.

Shortly after Fox called Arizona in favor of President Biden, many of former President Trump's supporters spread or supported false claims of election fraud.[48] Fox projected that former President Trump lost the 2020 U.S. Presidential Election on November 7, 2020.[49] On November 8, Fox and Ms. Bartiromo invited Ms. Powell to appear on the *Sunday Morning Futures* show.[50] Ms. Powell declared that there was

> a massive and coordinated effort to steal this election from We the People of the United States of America, to delegitimize and destroy votes for Donald Trump, to manufacture votes for Joe Biden.[51]

Ms. Bartiromo asked Ms. Powell: "Sidney, we talked about the Dominion software. I know that there were voting irregularities. Tell me about that."[52] To which Ms. Powell responded: "That's

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.* ¶ 32.
[48] *Id.* ¶ 40.
[49] *Id.* ¶ 44.
[50] *Id.* ¶ 45.
[51] *Id.*
[52] *Id.* ¶ 46.

6

putting it mildly….That is where the fraud took place, where they were flipping votes in the computer system or adding votes that did not exist….That's when they had to stop the vote count and go in and replace votes for Biden and take away Trump votes."[53]

Ms. Bartiromo previously reported that former President Trump's lead would not diminish due to fraud but because mail-in and absentee ballots would be counted later than in-person ballots.[54] Fox continued to promote, endorse, and republish falsehoods about Dominion for weeks on television and on digital platforms.[55]

Fox also provided a platform for Ms. Powell and Mr. Giuliani to claim that Dominion created voting machines to rig elections for Hugo Chavez in Venezuela.[56] This connection was based on the verifiably false claim that Dominion is owned by Smartmatic – Dominion's competitor.[57]

### F.  DOMINION EMAILS FACTS TO FOX TO REBUT FOX'S CLAIMS.

Dominion circulated an email titled "SETTING THE RECORD STRAIGHT: FACTS & RUMORS."[58] The email provided information to disprove the false claims Fox made about the company with links to independent sources.[59] Dominion sent the "SETTING THE RECORD STRAIGHT" emails to Fox's reporters and producers, including those who oversaw and managed content for *Lou Dobbs Tonight*, *Sunday Morning Futures*, *Mornings with Maria*, *Justice w/ Judge Jeanine*, *Hannity*, and other Fox shows.[60] Similarly, EAC Commissioner Ben Hovland notified Fox that the 2020 Election was "the most secure election we've ever had."[61]

---

[53] *Id.*
[54] *Id.* ¶ 48.
[55] *Id.* ¶ 58.
[56] *Id.* ¶ 59.
[57] *Id.* ¶ 60.
[58] *Id.* ¶ 64.
[59] *Id.*
[60] *Id.* ¶ 66.
[61] *Id.* ¶ 67.

Professor J. Alex Halderman, Director of the University of Michigan's Center for Computer Security & Society also told Fox that there "is absolutely no evidence…that Dominion Voting Machines changed any votes in this election."[62]

Despite these efforts, Fox continued to promote known lies on its broadcasts, websites, social media accounts and subscription service platforms.[63] Mr. Dobbs, Ms. Bartiromo, and Mr. Hannity also continued to give Ms. Powell and Mr. Giuliani a platform to disseminate lies about Dominion by hosting them on their shows.[64] Mr. Dobbs, Ms. Bartiromo and Mr. Hannity likewise endorsed and repeated those lies.[65] For example, Mr. Dobbs declared: "It's stunning. And they're private firms and very little is known about their ownership, beyond what you're saying about Dominion."[66] In addition, Mr. Dobbs said that "the states as you well know now, they have no ability to audit meaningfully the votes that are cast."[67]

Ms. Bartiromo continued promoting lies even though she had been specifically notified that independent fact-checkers, government officials and election security experts debunked those lies about Dominion.[68] Moreover, Ms. Bartiromo had actual knowledge that Georgia conducted a hand recount of every paper ballot.[69]

**G. FOX CONTINUES TO AIR ACCUSATIONS OF FRAUD AGAINST DOMINION.**

Dominion reached out to Fox's CEO Suzanne Scott and President and Executive Editor Jay Wallace to address Fox's false statements about Dominion.[70] Dominion spoke with Mr.

---

[62] *Id.* ¶ 68.
[63] *Id.* ¶ 70.
[64] *Id.*
[65] *Id.*
[66] *Id.* ¶ 71.
[67] *Id.*
[68] *Id.* ¶ 73.
[69] *Id.*
[70] *Id.* ¶ 76.

Wallace and informed him of the facts rebutting Fox's false claims.[71] Dominion also sent new

and updated versions of the "SETTING THE RECORD STRAIGHT" emails to Fox.[72]

Separately, fifty-nine specialists in election security publicly rebutted Fox's claims about

Dominion.[73]

Mr. Dobbs again hosted Ms. Powell on his show, where he knowingly gave her a

platform to falsely claim that Smartmatic was created in Venezuela to rig elections for Hugo

Chavez and that "Smartmatic owns Dominion."[74] Fox published those claims to its live audience

and republished them on its websites and social media accounts.[75]

The Maricopa County Board of Supervisors Chairman reported that there was no

evidence of voter fraud and that the hand count audit showed the machines generated an accurate

count.[76] The *Wall Street Journal* also reported that Dominion "was a linchpin in the 2020

election that federal and state officials praise as being free from tampering."[77] *The Wall Street

Journal* is owned by News Corp.[78] Rupert Murdoch is the Executive Chairman of News Corp.

and Lachlan Murdoch is the Co-Chairman.[79] The Murdochs are also in charge of Fox.[80]

Georgia completed its 100% hand audit recount.[81] Georgia's Secretary of State, Brad

Raffensperger reported that "Georgia's historic first statewide audit reaffirmed that the state's

new secure paper ballot voting system accurately counted and reported results."[82]

---

[71] *Id.*
[72] *Id.* ¶ 77.
[73] *Id.* ¶ 78.
[74] *Id.* ¶ 79.
[75] *Id.*
[76] *Id.* ¶ 80.
[77] *Id.* ¶ 81.
[78] *Id.* ¶ 83.
[79] *Id.*
[80] *Id.*
[81] *Id.* ¶ 84.
[82] *Id.*

Despite Arizona and Georgia's audits confirming the Dominion machines' accuracy, Mr. Dobbs and Mr. Hannity again brought on Mr. Giuliani and Ms. Powell to assert their claims that Dominion rigged the election by changing votes in its machines.[83] Mr. Dobbs previewed and endorsed why Ms. Powell returned to his show: She would "provide more details on how Dominion voting machines and Smartmatic software were used to help Joe Biden."[84] Ms. Pirro also claimed that Dominion was an organized criminal enterprise started in Venezuela with Cuban money that could and did flip votes with the assistance of Smartmatic software, thus creating ballot dumps that filled in votes for President Biden.[85]

Even after prominent Republicans and the Trump campaign itself publicly disavowed Ms. Powell, Fox continued to host Ms. Powell and Mr. Giuliani on its most-watched shows.[86] Fox's on-air personnel endorsed Ms. Powell and Mr. Giuliani's claims that Dominion was created in Venezuela to rig elections for Hugo Chavez and that Dominion rigged the 2020 U.S. election with vote-changing software.[87]

On November 26, 2020, Dominion sent another "SETTING THE RECORD STRAIGHT" email to Fox personnel, stating specific facts debunking claims that Dominion rigged the election in Pennsylvania.[88] For example, Dominion did not operate in many highly contested districts and former President Trump won twelve out of the fourteen counties in which Dominion operated.[89]

---

[83] *Id.* ¶ 85.
[84] *Id.*
[85] *Id.* ¶ 89.
[86] *Id.* ¶ 95.
[87] *Id.*
[88] *Id.* ¶ 96.
[89] *Id.*

On November 29, 2020, Ms. Bartiromo hosted former President Trump for an interview.[90] During this show, Ms. Bartiromo endorsed the claim that Dominion rigged the election, calling it disgusting and corrupt.[91] That same day, Dominion sent out fact sheets including links to independent websites disproving claims that Dominion rigged the election in Arizona and Michigan.[92]

On November 30, 2020, Fox hosted Ms. Powell on *Hannity*.[93] On *Hannity*, Ms. Powell claimed that Dominion machines

> ran an algorithm that shaved off votes from Trump and awarded them to Biden. And they used the machines to trash large batches of votes that should have been awarded to President Trump. And they used the machines to inject and add massive quantities of votes for Mr. Biden.[94]

Mr. Hannity did not correct Ms. Powell or notify his viewers that he and his show's producers had seen evidence disproving those claims.[95]

On the same day, Mr. Dobbs claimed:

> We have, across almost every state, whether it's Dominion, whatever the company – voting machine company is, no one knows their ownership, has no idea what's going on in those servers, has no understanding of the software, because it's "proprietary." It is the most ludicrous, irresponsible, and rancid system imaginable in the world's only superpower.[96]

On December 1, 2020 then-U.S. Attorney General Bill Barr stated that the DHS and DOJ found nothing substantiating the claim that voting machines were programmed to skew election results.[97] Nonetheless, Fox continued to host Ms. Powell and Mr. Giuliani and Fox personnel

---

[90] *Id.* ¶ 97.
[91] *Id.* ¶ 98.
[92] *Id.* ¶ 99.
[93] *Id.* ¶ 100.
[94] *Id.*
[95] *Id.*
[96] *Id.* ¶ 101.
[97] *Id.* ¶ 102.

11

endorsed their fraud claims.[98]  In the two-week period after Fox news declared President Biden the president-elect, the network questioned results of the election or pushed conspiracy theories at least 774 times.[99]  Fox reported that by mid-December, seventy percent of Republicans thought the election was rigged because of voter fraud.[100]

On December 10, 2020, Fox tweeted a promotion for *Lou Dobbs Tonight* stating: "The 2020 Election is a cyber Pearl Harbor: The leftwing establishment have aligned their forces to overthrow the United States government #MAGA #AmericaFirst #Dobbs."[101]  Fox also embedded a document in the tweet claiming to prove that Dominion concealed a controller within the machines that manipulated the machines through the internet, and that Dominion colluded with the Democratic Party and China to commit voting fraud.[102]  Hours after this tweet, Mr. Dobbs asked Ms. Powell how Dominion rigged the election and how Dominion engaged in a "coordinated effort to actually bring down this President."[103]  Mr. Dobbs claimed to have tremendous evidence to support Ms. Powell's claim and invited Ms. Powell to put forward evidence as well.[104]

On December 16, 2020, Ms. Bartiromo announced that an "intel source" told her that former President Trump won the election.[105]

### H. LOU DOBBS ADMITS THAT HE LACKED EVIDENCE OF THE FRAUD CLAIMS.

On January 4, 2021, Mr. Dobbs stated "We're 8 weeks from the election and we still don't have verifiable tangible support for the crimes that everyone knows were committed.  That

---

[98] *Id.* ¶ 104.
[99] *Id.* ¶ 105.
[100] *Id.*
[101] *Id.* ¶ 107.
[102] *Id.* ¶ 108.
[103] *Id.* ¶ 110.
[104] *Id.*
[105] *Id.* ¶ 111.

is, defrauding other citizens who voted with fraudulent votes . . . we have had a devil of a time finding actual proof."[106]

Fox News personalities also did not assert that Dominion voting machines worked improperly when a Democratic candidate protested a Republican victory using Dominion counted votes.[107]

## I. THE DOMINION CLAIMS ARE WIDELY PUBLISHED.

During election and post-election coverage, Fox estimated that it reached 200 million people a month through its Fox News Media distribution channels.[108] Over two million Fox viewers tuned in for former President Trump's November 29, 2020 appearance.[109] Fox later republished the appearance across digital platforms.[110] The Lou Dobbs promotion tweet, including the two-page typewritten memorandum on machine controlling devices, was published to over 2 million Twitter followers.[111] Fox also routinely tagged Former President Trump in tweets to reach Trump's more than 88 million followers.[112] The Dominion fraud claims then were disseminated as people tweeted and retweeted that Dominion stole their votes.[113] By November 12, 2020, 81% of Trump voters believed that fraud influenced the election outcome.[114]

---

[106] *Id.* ¶ 114.
[107] *See id.* ¶¶ 115—17.
[108] *Id.* ¶ 119.
[109] *Id.* ¶ 120.
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.* ¶ 121.
[114] *Id.* ¶ 122.

## J. FOX AND TUCKER CARLSON PROVIDE A PLATFORM FOR MYPILLOW CEO MIKE LINDELL.

On January 26, 2021, Twitter banned MyPillow CEO Mike Lindell for promoting claims about Dominion fraud.[115] The same day, Fox invited Mr. Lindell onto *Tucker Carlson Tonight* to discuss his Twitter ban.[116] Mr. Carlson endorsed Mr. Lindell's claim that Mr. Lindell found the machine fraud and had all the evidence.[117]

## K. DOMINION SUFFERS HARM FROM THE FRAUD ACCUSATIONS.

Dominion alleges harm due to the voting fraud accusations. The viral fraud claims linked Dominion to fraud.[118] For example, in January 2021, Google searches for "dominion voting fraud" yielded over 8.4 million results; 1.9 million results for "dominion manipulate vote"; and over 18.9 million results for "who manufactures dominion voting machines.[119] Dominion and its employees have received death threats and calls for jail time.[120] Dominion has spent over $600,000 on private security because of these threats.[121] Dominion has also spent more than $700,000 in attempting to mitigate harm caused by the viral disinformation campaign.[122] Election officials – Dominion's actual and potential customers – have received emails, letters, and calls from their constituents demanding that they cease and avoid contracting with Dominion or using Dominion machines.[123]

Legislators in various states where Dominion contracts – including Arizona, California, Colorado, Florida, Michigan, Ohio and Pennsylvania – stated their intent to review and reassess

---

[115] *Id.* ¶ 138.
[116] *Id.* ¶ 140.
[117] *Id.*
[118] *See id.* ¶¶ 149—60.
[119] *Id.* ¶ 160.
[120] *Id.* ¶ 161.
[121] *Id.*
[122] *Id.* ¶ 169.
[123] *Id.* ¶ 171.

14

the Dominion contracts.[124] Louisiana cancelled its reassessment and bid process, prohibiting Dominion from securing a new $100-million-plus contract.[125] Louisiana's Secretary of State, Kyle Ardoin, said Louisiana cancelled the bid process because of "damage to voter confidence done by those who willfully spread misinformation and disinformation."[126] Dominion also lost a $10 million contract in Stark County, Ohio.[127] Stark County already had awarded the contract to Dominion, the contracts were fully negotiated, and only awaited perfunctory approval of the Board of Commissioners.[128] After Fox published the Dominion fraud claims, the Board of Commissioners delayed its vote, reversed course and attempted to award the contract to a Dominion competitor, ES&S.[129]

Dominion projects a lost profit of over $600 million over the next eight years.[130]

## L. THE COMPLAINT'S SPECIFIC ALLEGATIONS AS TO FALSE AND DEFAMATORY STATEMENTS

On a November 8, 2020 *Sunday Morning Futures* broadcast:

Powell: Yes. There has been a massive and coordinated effort to steal this election from We the People of the United States of America, to delegitimize and destroy votes for Donald Trump, to manufacture votes for Joe Biden…[T]hey…used an algorithm to calculate the votes they would need to flip and they used computers to flip those votes…from Trump to Biden . . . .

Bartiromo: Sidney, I want to ask you about these algorithms and the Dominion software….Sidney, we talked about the Dominion software. I know that there were voting irregularities. Tell me about that.

Powell: That's putting it mildly. The computer glitches could not and should not have happened at all. That is where the fraud took place, where they were flipping votes in the computer system or adding votes that did not exist. We need an audit of all the computer systems that played any role in this fraud whatsoever….They

---

[124] *Id.* ¶ 172.
[125] *Id.* ¶ 173.
[126] *Id.*
[127] *Id.* ¶ 174.
[128] *Id.*
[129] *Id.*
[130] *Id.* ¶ 177.

had the algorithms….That's when they had to stop the vote county and go in and replace votes for Biden and take away Trump votes.

Bartiromo: I've never seen voting machines stop in the middle of an election, stop down and assess the situation.[131]

On the November 12, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs:  Let's talk about, just for a moment, an update on Dominion . . .

Giuliani:  Dominion is a company that's owned by another company called Smartmatic, through an intermediary company called Indra.  Smartmatic is a company that was formed…by three Venezuelans who were very close to, very close to the dictator, Chávez of Venezuela and it was formed in order to fix elections.  That's the company that owns Dominion….[A]ll of its software is Smartmatic software….So we're using a…company that is owned by Venezuelans who were close to – were close to Chávez, are now close to Maduro, have a history, they were founded as a company to fix elections….

Dobbs:  It's stunning.  And they're private firms and very little is known about their ownership, beyond what you're saying about Dominion.  It's very difficult to get a handle on just who owns what and how they're being operated.  And by the way, the states, as you well know now, they have no ability to audit meaningfully the votes that are cast because the servers are somewhere else and are considered proprietary and they won't touch them.   They won't permit them being touched….This looks to me like it is the end of what has been a four-and-a-half – the endgame to a four-and-a-half yearlong effort to overthrow the President of the United States.  It looks like it's exactly that….This election has got more firsts than any I can think of and Rudy, we're glad you're on the case and pursuing what is the truth.[132]

On the November 13, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs:  Let's start with Dominion, a straight-out disavowal of any claim of fraud against the company, its software or machines.  Your reaction.

Powell: Well, I can hardly wait to put forth all the evidence we have collected on Dominion, starting with the fact it was created to produce altered voting results in Venezuela for Hugo Chávez and then shipped internationally to manipulate votes for purchase in other countries, including this one….We also need to look at and we're beginning to collect evidence on the financial interests of some of the governors and Secretaries of State who actually bought into the Dominion Systems, surprisingly enough – Hunter Biden type graft to line their own pockets by a getting

---

[131] *Id.* ¶ 179.
[132] *Id.*

16

voting machine in that would either make sure their election was successful or they got money for their family from it.

Dobbs: Well, that's straightforward.

Powell: People need to come forward now and get on the right side of this issue and report the fraud they know existed in Dominion Voting Systems, because that's what it was created to do. It was its sole original purpose. It has been used all over the world to defy the will of people who wanted freedom.

Dobbs: Sidney, at the outset of this broadcast I said that this is the culmination of what has been an over a four-year effort to overthrow this president; to first deny his candidacy, the election, but then to overthrow his presidency. This looks like the effort to carry out an endgame in the effort against him. Do you concur?

Powell: Oh, absolutely . . . .

Dobbs: Well, good, because this is an extraordinary and such a dangerous moment in our history….Sidney, we're glad that you are on the charge to straighten out all of this. It is a foul mess and it is far more sinister than any of us could have imagined, even over the course of the past four years.[133]

A November 14, 2020 statement on the @loudobbs Twitter account:

Read all about the Dominion and Smartmatic voting companies and you'll soon understand how pervasive this Democrat electoral fraud is, and why there's no way in the world the 2020 Presidential election was either free or fair. #MAGA @realDonaldTrump #AmericaFirst #Dobbs.[134]

Embedded in that tweet was a Mr. Giuliani tweet:

Did you know a foreign company, DOMIMION, [sic] was counting our vote in Michigan, Arizona and Georgia and other states. But it was a front for SMARTMATIC, who was really doing the computing.[135]

On the November 14, 2020 *Justice w/ Judge Jeanine* broadcast:

Pirro: The Dominion software system has been tagged as one allegedly capable of flipping votes. Now you'll hear from Sidney Powell in a few minutes who will explain what she has unearthed in the creation of Dominion.

Powell: I am working on the massive aspect of – of system-wide election fraud, definitely impacting the swing states and likely going far beyond that. We're

---

[133] *Id.*
[134] *Id.*
[135] *Id.*

17

talking about the alteration and changes in millions of – of votes; some being dumped that were for President Trump, some being flipped that were for President Trump, computers being overwritten to ignore signatures. All kinds of different means of manipulating the Dominion and Smartmatic software that, of course, we would not expect Dominion or Smartmatic to admit.

Pirro: I assume that you are getting to the bottom of exactly what Dominion is, who started Dominion, how it can be manipulated if it is manipulated at all, and what evidence do you have to prove this?....If you could establish that there is corruption in the use of this software, this Dominion software, as you allege, and you say you have evidence, how do you put that together and prove that on election night, or immediately after, that at the time the votes were being tabulated or put in, that we can prove that they were flipped?

Powell: It was created for the express purpose of being able to alter votes and secure the re-election of Hugo Chávez and then Maduro….There's an American citizen who has exported it to other countries. And it is one huge, huge criminal conspiracy that should be investigated by military intelligence for its national security implications.

Pirro: Yes, and it – hopefully, the Department of Justice, but – but who knows anymore. Sidney Powell, good luck on your mission.[136]

On the November 15, 2020 *Fox and Friends Sunday* broadcast:

Bartiromo: [S]o much news on the software that was used on the voting machines on election night. There is much to understand about Smartmatic, which owns Dominion Voting Systems. They have businesses in Venezuela, Caracas….We're going to talk about it with Rudy Giuliani and why he does believe he will be able to overturn this election with evidence. He will join me along with Sidney Powell to give us an update on their investigation. This is very important to understand what was going on with this software. Sidney Powell is also talking about potential kickbacks that government officials who were asked to use Dominion actually also enjoyed benefits to their families.[137]

On the November 15, 2020 *Sunday Morning Futures* broadcast:

Bartiromo: Plus, Sidney Powell on the Venezuela connection and whether kickbacks were involved for those taking on Dominion voting machines, as a hand recount of nearly five million ballots is under way in Georgia.

Giuliani: [T]he rigging…went on….[A] company that did the votes in 27 states…uses Venezuela company software that's been used to steal elections in other countries….And the software that they use is done by a company called

[136] *Id.*

[137] *Id.*

Smartmatic. It's a company that was founded by Chávez and by Chávez's two allies, who still own it. And it's been used to cheat in elections in South America….Dominion sends everything to Smartmatic. Can you believe it? Can you believe it? Our votes are sent overseas. They are sent to someplace else, some other country. Why do they leave our country?

Bartiromo: Yes.

Giuliani: And this company had – and this company has tried-and-true methods for fixing elections by calling a halt to the voting when you're running too far behind. They have done that in prior elections….In Detroit, we have evidence that 100,000 ballots were brought in at 4:30 in the morning and counted and to the extent that our witnesses and there are four of them saw it, and one of them is an ex-employee of Dominion, and according to them every single ballot was for Biden and not only that whatever ballots they could see because they weren't Republican so they could get closer, every ballot they could see just had Biden's name on it, nobody else, not even another Democrat. Why does that happen? It happens because you know you're behind, Dominion notifies you, you call off the counting and then you start doing ballots like this.

Bartiromo: Look, I want to show this graphic of the swing states that were using Dominion and this software, the Smartmatic software. You just said it all. This is a Smartmatic, a Delaware entity registered in Boca Raton, Florida, activities in Caracas, Venezuela. The voting machines were used, Dominion voting machines were used in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. And I have a graphic showing the states where they stopped counting, which I thought was also strange, to stop counting in the middle of election night. One source says that the key point to understand is that the Smartmatic system has a backdoor that allows it to be….

Giuliani: Yeah.

Bartiromo: …or that allows the votes to be mirrored and monitored, allowing an intervening party a real-time understanding of how many votes will be needed to gain an electoral advantage. Are you saying the states that use that software did that?

Giuliani: I know I can prove that they did it in Michigan. I can prove it, with witnesses….[Y]es, there is a backdoor.

Bartiromo: Right.

Giuliani: We have people that I can't really disclose, that can describe the hardware in great detail. We have some of the people, former government employees, our government employees, and others that were there at the creation of Smartmatic, they can describe it. They can draw it, they can show it, and then we have proof

19

that I can't disclose yet….I mean, I can't imagine you'd give a contract to a company, if you went one step further and found out it's really being run by people that are close to Maduro and Chávez.

Bartiromo: According to public records, Dominion voting machines are used in 2,000 jurisdictions in 30 states….That's troubling, given we already know that at least two software glitches in Georgia and Michigan occurred on election night. Attorney Sidney Powell is leading the charge against Dominion. And she says she has enough evidence of fraud to launch a massive criminal investigation….I want to get right into it. We just heard about the software made by Smartmatic from Rudy.

Powell: President Trump won by not just hundreds of thousands of votes but by millions of votes that were shifted by this software that was designed expressly for that purpose. We have sworn witness testimony of why the software was designed. It was designed to rig elections….It was exported internationally for profit by the people that are behind Smartmatic and Dominion. They did this on purpose. It was calculated. They have done it before. We have evidence from 2016 in California. We have so much evidence I feel like it's coming in through a fire hose.

Bartiromo: Wow, so, Sidney, you feel that you will be able to prove this? Do you have the software in your possession? Do you have the hardware in your possession? How will you prove this, Sidney?

Powell: Well, I have got lots of ways to prove it, Maria, but I'm not going to tell on national TV what all we have. I just can't do that….[T]his is a massive election fraud, and I'm very concerned it involved not only Dominion and its Smartmatic software, but that the software essentially was used by other election machines also. It's the software that was the problem….They can put – it's like drag-and-drop – Trump votes to a separate folder and then delete that folder….We have even got evidence of some kickbacks, essentially.

Bartiromo: Kickbacks. I want to take a short break and come back on that. And I want to ask you about the kickbacks and who took kickbacks in which states….You said that there may have been kickbacks to some people who accepted the Dominion software. Tell me what you mean.

Powell: Well, I mean we're collecting evidence now from various whistle-blowers that are aware of substantial sums of money being given to family members of state officials who bought this software. I mean, we're talking about $100 million packages for new voting machines suddenly in multiple states, and benefits ranging from financial benefits for family members to sort of what I would call election insurance, because they know that they can win the election if they are using that software.

20

Bartiromo: Which governor or which government official accepted hundreds of millions of dollars in benefits for their family as they took on this software?

Powell: We're still collecting the evidence on that, but it's more than one.

Bartiromo: OK. So, you can't say who you believe took kickbacks….We have identified mathematically the exact algorithm they used and planned to use from the beginning to modify the votes, in this case, to make sure Biden won….It's massive election fraud. It's going to undo the entire election.

Bartiromo: And, Sidney, you say you have an affidavit from someone who knows how this system works and was there with the planning of it. You believe you can prove this in court?

Powell: Oh, yes. We have a sworn – essentially, a sworn statement from a witness who knew exactly how it worked from the beginning, why it was designed to work that way, and saw when things started shutting down, and they started – stopped counting the votes here. That was the same play that had worked in other countries.

Bartiromo: Wow. This is explosive.[138]

On the November 16, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs: President Trump's legal team says potentially rigged voting machines demand a national security investigation. They are pointing to Dominion Voting Systems' widely used ballot-scanning machines whose software is suspected of inflating vote totals for Joe Biden. Dominion systems used in more than two dozen states. Dominion also one of three companies accounting for almost 90% of the voting equipment in the U.S. elections….Dominion Voting Systems seems to be figuring larger and larger in the interest of your legal team, and what is the latest?

Powell: Oh, definitely, Lou. I've just gotten some stunning evidence from a firsthand witness, a high-ranking military officer, who was present when Smartmatic was designed in a way that – and I'm going to just read to you some of these statements, if you don't mind, so I get them exactly right.

Dobbs: Sure.

Powell: From the affidavit: Designed in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumbprint or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted but that voter would not be tracked to the changed vote. He made it clear that the system would have to be set up but not leave any evidence of the changed vote for a specific voter, and that there would be no evidence to

[138] *Id.*

show and nothing to contradict that the name or the fingerprint or thumbprint was going with a changed vote. Smartmatic agreed to create such a system and produce the software and hardware that accomplished the result for President Chávez. After the Smartmatic electoral management system was put in place, he closely observed several elections where the results were manipulated using the Smartmatic software….Persons controlling the vote tabulation computer had the ability to change the reporting of votes by moving votes from one candidate to another by using the Smartmatic software, and on and on it goes.

Dobbs: And Smartmatic, the relation –

Powell: Smartmatic owns Dominion.

Dobbs: Yes….It's – it is a deeply, deeply troubling election, as I said earlier, the worst in this country's history, bar none, and we have seen official investigative and Justice Department officials slow to move, and it is infuriating to everyone.

Powell: No, we've seen willful blindness. They have adopted a position of willful blindness to this massive corruption across the country, and the Smartmatic software is in the DNA of every vote tabulating company's software and system.

Dobbs: Yes, and it is more than just a willful blindness. This is people trying to blind us to what is going on.[139]

On a November 18, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs: I want to share with the audience one of the affidavits that has been given to us by an unidentified whistleblower, and it pertains to Dominion….I am alarmed because of what is occurring in plain sight during this 2020 election for president of United States. The circumstances and events are eerily reminiscent of what happened with Smartmatic software electronically changing votes in the 2013 presidential election in Venezuela. What happened in the United States was that the vote counting was abruptly stopped in five states using Dominion software. At the time that vote counting was stopped, Donald Trump was significantly ahead in the votes. Then during the wee hours of the morning, when there was no voting occurring and the vote count reporting was offline, something significantly changed. When the vote reporting resumed the very next morning, there was a very pronounced change in voting in favor of the opposing candidate, Joe Biden. That from a whistleblower who was present both in Venezuela in 2013 and in this country as we were counting votes overnight on November 3rd. Your thoughts.

Giuliani: Our votes in 27, 28 states that are counted by Dominion….And the company counting it is not Dominion, it's Smartmatic, which is a company that was founded in 2005 in Venezuela for the specific purpose of fixing elections. That's their expertise, how to fix elections. They did it a number of times in Venezuela,

[139] *Id.*

they did it in Argentina….Well, that's the company that was counting and calculating on election night. And they did all their old tricks. They stopped it, they also switched votes around, subtly, maybe 10 per district so you don't notice it. They got caught in Antrim County, which is how we found out about them.

Dobbs: It's outrageous.

Giuliani: We shouldn't be using this company that was founded by Chávez to call votes in America, because their specialty in Venezuela is cheating….And they're using a Venezuelan company as the vote counter, which is known for changing votes.[140]

On the November 19, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs: Another issue at the center of today's news conference, the use of Dominion voting machines and Smartmatic software. Defense attorney Sidney Powell cited a whistleblower's stunning affidavit. It says Smartmatic's technology was used to rig elections in Venezuela. It is now in the, quote, "DNA of every vote tabulating company software and system." Smartmatic and Dominion deny those charges, but Sidney Powell argues that algorithms in the Smartmatic software were used to change results in the presidential election….One of the team members, Sidney Powell, among our guests here tonight. She will be providing more details on how Dominion voting machines and Smartmatic software were used to help Joe Biden….Let's turn to Smartmatic and Dominion. Are they or are they not linked?

Powell: Oh, they're definitely linked. I would call them inextricably intertwined. They have the same history from their inception. I'm sure they're trying to distance themselves from each other, but the fact is that the Dominion machines run the Smartmatic software or parts of the key code of it, and that is what allows them to manipulate the votes in any way the operators choose to manipulate them; and every time there was a glitch, they called it, or connection to the internet, they also violated state laws that required the machines to be certified and nothing to be changed before the votes.

Dobbs: And it's the presumption then that they had the records on those servers of all of the votes that were processed by Dominion or Smartmatic?

Powell: Yes….It could have run an automatic algorithm against all the votes, which we believe is what happened originally and then the machines had to stop or the counting had to stop in multiple places because President Trump's lead was so great at that point they had to stop the counting and come in and backfill the votes they needed to change the result….There's thousands of people in federal prisons on far less evidence of criminal conduct than we have already against the Smartmatic and Dominion Systems companies.

---

[140] *Id.*

Dobbs: We have just watched, to everyone in this audience tonight, our election is run by companies, the ownership of which we don't know.[141]

On the November 21, 2020 *Justice w/ Judge Jeanine* broadcast:

Pirro: The president's lawyers alleging a company called Dominion, which they say started in Venezuela with Cuban money and with the assistance of Smartmatic software, a backdoor is capable of flipping votes….Now, why was there an overnight popping of the vote tabulation that cannot be explained for Biden?[142]

On the November 24, 2020 *Lou Dobbs Tonight* broadcast:

Powell: [T]here's no doubt that the software was created and used in Venezuela to control the elections and make sure that Hugo Chávez was always reelected as the dictator of Venezuela in what appeared to be, quote, free and fair elections, end quote, but they were manipulated by the software used in the Dominion machines – and used by other machines in the United States, frankly, and we are just continuing to be inundated by evidence of all the frauds here

Dobbs: I think many Americans have given no thought to electoral fraud that would be perpetrated through electronic voting; that is, these machines, these electronic voting companies, including Dominion, prominently Dominion, at least in the suspicions of a lot of Americans.[143]

On the November 30, 2020 *Lou Dobbs Tonight* broadcast:

Powell: [W]e need, frankly, to stop the election that's supposed to happen in January because all the machines are infected with the software code that allows Dominion to shave votes for one candidate and give them to another, and other features that do the same thing….Different states shaved different amounts of votes or the system was set up to shave and flip different votes in different states. Some people were targeted as individual candidates. It's really the most massive and historical egregious fraud the world has ever seen.

Dobbs: You know, people don't go to jail for their attitude, but in the case of the Secretary of State and the Governor of Georgia right now, one would be tempted to prosecute based on their conduct so far. What is going on with those two individuals?

Powell: [I]t seems that there were significant benefits for both Governor Kemp and perhaps Mr. Raffensperger also, and maybe others on their team, for deciding at the last minute to rush in a contract for Dominion for $107 million for the state.

---

[141] *Id.*
[142] *Id.*
[143] *Id.*

Dobbs: Now, do we know – you know, I just can't – I think most Americans right now cannot believe what we are witnessing in this election. We have, across almost every state, whether it's Dominion, whatever the company – voting machine company is, no one knows their ownership, has no idea what's going on in those servers, has no understanding of the software, because it's proprietary. It is the most ludicrous, irresponsible and rancid system imaginable in the world's only superpower.

Powell: Dominion and its minions and other state officials everywhere are apparently out there trying to destroy everything they can get to before we can seize it . . . .

Dobbs: And as I said at the outset of the broadcast, Sidney, this is no longer about just voter fraud or electoral fraud, this is something much bigger and this president has to take, I believe, drastic action, dramatic action, to make certain that the integrity of this election is understood, or lack of it, the crimes that have been committed against him and the American people.[144]

On the November 30, 2020 *Hannity* broadcast:

Powell: The machine ran an algorithm that shaved votes from Trump and awarded them to Biden. They used the machines to trash large batches of votes that should have been awarded to President Trump. And they used a machine to inject and add massive quantities of votes for Mr. Biden.[145]

On the December 4, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs: At the center of it all, Dominion Voting Systems. Are they the culprit here? Not the only culprit, but are they the principal culprit?....But concomitantly, Dominion Voting Systems, with – you have described it, with algorithms in which – which were designed to be inaccurate rather than to be a secure system.[146]

Fox and Mr. Dobbs published a December 10, 2020 statement to the @loudobbs Twitter

account:

The 2020 Election is a cyber Pearl Harbor: The leftwing establishment have aligned their forces to overthrow the United States government #MAGA #AmericaFirst #Dobbs.[147]

Fox embedded in the tweet a typewritten document with no other markings or attributions:

---

[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*

We have a warning to the mainstream media: you have purposely sided with the forces that are trying to overthrow the US system. These four people and their collaborators executed an electoral 9-11 against the United States, with the cooperation and collusion of the media and the Democrat Party….It is a cyber Pearl Harbor. We have identities, roles, and background of Dominion. Smartmatic people. This will turn into a massive RICO filing. It is Smartmatic, Dominion Voting Systems, Sequoia, SGO….We have technical presentations that prove there is an embedded controller in every Dominion machine….We have the architecture and systems, that show how the machines can be controlled from external sources, via the internet, in violation of voting standards, Federal law, state laws, and contracts.[148]

On the December 10, 2020 *Lou Dobbs Tonight* broadcast:

Dobbs: You say these four individuals [Jorge Rodriguez, Khalil Majzoub, Gustavo Reyes-Zumeta, Antonio Mugica] led the effort to rig this election. How did they do it?

Powell: Well, Lou, they designed and developed the Smartmatic and Dominion programs and machines, that include a controller module that allows people to log in and manipulate the vote, even as it's happening. We're finding more and more evidence of this. We now have reams and reams of actual documents from Smartmatic and Dominion, including evidence that they planned and executed all of this….We have evidence of how they flipped the votes, how it was designed to flip the votes. And that all of it has been happening just as we've been saying it has been….[T]he entire system was created for the benefit of Venezuela and Hugo Chávez to rig elections to make sure he continued winning. And then it was passed on to Mr. Maduro to do the same. And we know it was exported to other countries by virtue of some of the Dominion executives that proceeded to go about and essentially sell elections to the highest bidder….It is a very concerning and troubling and illegal web of conduct that all of which focused on rigging the election in this country. And we are seeing the results in multiple states where we're now identifying specific votes flipped, like in a couple of Georgia counties.

Dobbs: We're going to examine in some detail the – the reasons for what is apparently a broadly coordinated effort to – to actually bring down this President by ending his second term before it could begin….[I]t's outrageous that we have an Attorney General, Sidney, who has said that he sees no sign of – of any significant fraud that would overturn the election. We had a head of the cyber intelligence unit for the Department of Homeland Security who is suing some people, apparently, for saying that his report basically, was – it was nonsense when he declared it was the most secure election in the country's history. What are we dealing with here, and how can we get to this, if we have a – an Attorney General who has apparently lost both his nerve and his commitment to his oath of office, and to the country; we have an FBI director who seems to be as politically corrupt

---

[148] *Id.*

26

as anyone who preceded him, and a Homeland Security department that doesn't know what the hell it's talking about and is spending more time playing politics, at least as it applies to Mr. Krebs, than securing the nation.

Powell: President Trump won so many votes, he blew up their algorithm. The American people blew up the algorithm they created before the election to shave votes from Biden and give them to Trump. And we're now seeing direct evidence of that happening in – in multiple counties and multiple states, and we know it happened across the country….

Dobbs: Let me – let me make you an offer very straightforwardly: We will gladly put forward your evidence that supports your claim that this was a Cyber Pearl Harbor. We have tremendous evidence already but – of fraud in this election, but I will be glad to put forward on this broadcast whatever evidence you have, and we'll be glad to do it immediately.

Powell: Awesome.

Dobbs: We'll work overnight. We will – we will take up whatever air we're permitted beyond this broadcast, but we have to get to the bottom of this.

Dobbs: I mean the governor and the state – Secretary of State have got to find, if not the integrity, the – the primal fear of the voters in Georgia to stop what's going on and stop it now….How much time do you need to get that evidence to this broadcast and we'll put it on the air?

Powell: I'll get you more information that's just stunning tonight.[149]

On December 10, 2020, Fox and Mr. Dobbs published a statement to the @loudobbs Twitter account:

Cyber Pearl Harbor: @SidneyPowell1 reveals groundbreaking new evidence indicating our Presidential election came under massive cyber-attack orchestrated with the help of Dominion, Smartmatic, and foreign adversaries. #Maga #AmericaFirst #Dobbs.[150]

On the December 12, 2020 *Fox & Friends* broadcast:

Giuliani: [W]e have a machine, the Dominion machine…was developed to steal elections, and being used in the states that are involved.[151]

---

[149] *Id.*
[150] *Id.*
[151] *Id.*

27

On the January 26, 2021 *Tucker Carlson Tonight* broadcast:

> Carlson: Well, of course you will likely recognize our next guest. His name is Mike Lindell. He runs My Pillow. He advertises every night on this show and across Fox News. He's one of our biggest sponsors, and we are grateful for that.
>
> Lindell: [S]omeone put up on – on the internet, actual machine – new machine election fraud, I – I retweeted it….Dominion…said they were going to go after Mike Lindell. Well they did. They hired hit groups, bots and trolls went after all my vendors, all these box stores to cancel me out….I'm not backing down. We cannot back down out of fear this time.
>
> Carlson: I totally agree.
>
> Lindell: I've been all in trying to find the machine fraud and I – we found it. We have all the evidence….I have the evidence….I dare Dominion to sue me because then it will get out faster. So this is – it – you know, they don't – they don't want to talk about it.
>
> Carlson: No they don't.[152]

### M. CERTAIN FOX PERSONALITIES DECLINE TO ENDORSE THE CLAIMS THAT DOMINION CONTRIBUTED TO VOTER FRAUD.

While Ms. Bartiromo, Mr. Dobbs, Ms. Pirro, Mr. Hannity, Mr. Carlson, and other Fox personalities supported the Dominion fraud narrative, other Fox personnel declined to endorse the fraud claims.[153] For example:

- Fox's then-Politics Editor Chris Stirewalt defended Fox's Arizona call the day after the election, stating: "We haven't seen any evidence yet that there's anything wrong."

- Fox anchor Bret Baier reported on November 6: "We are not seeing any evidence of widespread fraud. We are not seeing anything that can change, right now at least, the split in these different States."

- By November 10, 2020 Fox's Laura Ingraham called out Ms. Powell on the air for making false statements about Dominion.

- On November 12, 2020, Fox's *America's Newsroom* show concluded that "nothing filed, any challenge so far, appears likely to overturn the results in any state."

---

[152] *Id.*
[153] *Id.* ¶ 181.

- On November 12, 2020, Fox news anchor Eric Shawn called the lies about Dominion "disinformation."

- On November 18, 2020, Fox's Brit Hume tweeted a link to a November 17 *Wall Street Journal* editorial chastising former President Trump and others for blaming the election results on Dominion's systems without any evidence, and added the comment, "Good question…President Trump blames the election result on Dominion's systems. Where's the evidence?"

- On November 19, 2020, Mr. Carlson called out Ms. Powell for failing to produce any evidence to support her Dominion claims. Mr. Carlson concluded that Ms. Powell "never demonstrated that a single actual vote was moved illegitimately by software from one candidate to another. Not one."

- On November 20, 2020, Mr. Hume tweeted facts disproving the Dominion fraud claims. The tweet summarized a November 20, 2020 *National Review* article that explained why those who believe the Dominion fraud claims "have been conned."[154]

## N. Procedural Posture

Dominion filed the Complaint in this action seeking to recover for defamation per se on March 26, 2021.[155] The Complaint is detailed and contains two hundred and four paragraphs and is one hundred and thirty-seven pages long.[156] In addition, Dominion attaches three hundred and two pages of exhibits to the Complaint.

The Court entered an order holding that New York tort law applied on April 27, 2021.[157] Fox filed the Motion on May 18, 2021.[158] Dominion opposed the Motion on June 8, 2021.[159] The Court held a hearing on the Motion on August 30, 2021.[160]

---

[154] *Id.*
[155] D.I No. 1.
[156] *Id.*
[157] D.I. No. 40.
[158] D.I. No. 45.
[159] D.I. No. 60.
[160] D.I. No. 93.

## III. PARTIES' CONTENTIONS

Fox argues that multiple constitutional doctrines protect Fox's alleged defamatory speech. First, Fox contends that truthfully reporting newsworthy allegations made by a sitting president and his legal team on matters of public concern is not actionable. Second, Fox claims that the media is completely protected when reporting and commenting about allegations made in government proceedings. Third, Fox asserts that opinion and hyperbolic rhetoric about newsworthy allegations are constitutionally protected. Finally, Fox claims that none of the challenged individual statements identifies actionable defamation against Fox.

Dominion argues that no privilege applies. Dominion notes that New York does not recognize the defense that the media is merely neutrally reporting defamatory allegations made by another party (the "neutral reportage defense"). Next, Dominion contends that, even if the Court recognized the neutral reportage defense, a jury could find that Fox went beyond neutral reportage by broadcasting manifestly irresponsible sources, espousing and concurring with the defamatory statements and communicating defamatory statements in its own voice. Dominion also argues that the "fair report" privilege does not protect Fox's defamatory statements because the privilege is limited to actual, accurate reports about a specific governmental proceeding. In addition, Dominion contends the challenged statements are actionable statements of mixed opinion or opinion based on false facts. Finally, Dominion asserts that it has alleged facts from which the Court may infer actual malice.

## IV. STANDARD OF REVIEW

The parties propose two different standards of review. Fox contends that New York's "anti-SLAPP" statute provides the standard of review. Dominion disagrees and argues Delaware's reasonable conceivability test provides the standard of review. The Court must

30

decide whether Delaware or New York procedural law governs the Motion in order to determine which standard applies. For the reasons below, the Court will apply Delaware's procedural law at this stage and defer the question of whether New York's anti-SLAPP law will apply at all to a later stage in the case.

### A. DELAWARE PROCEDURAL LAW, NOT NEW YORK'S ANTI–SLAPP LAW, PROVIDES THE LEGAL STANDARD THAT APPLIES TO THE MOTION.[161]

The Court of Chancery has explained the background and purpose of "anti–SLAPP" laws.[162] A SLAPP suit is an action

> brought in response to efforts by individuals or groups to participate in the democratic process by some person or entity that claims to have been wronged through that participation.[163]

A "Strategic Lawsuit Against Public Participation," or a SLAPP suit, is disfavored because it does not truly seek to remedy defamation, but rather to stifle or silence the alleged speaker's free speech. Given that SLAPP suits potentially could chill constitutionally-protected speech, many states, including Delaware and New York, have adopted "anti–SLAPP" laws.[164]

Consistent with the purpose of deterring SLAPP lawsuits, New York's anti–SLAPP statute protects "free speech in connection with an issue of public interest."[165] The statute instructs that the term "public interest" should be construed broadly.[166] The statute applies to a defamation case premised on any statement other than a statement addressing "a purely private matter."[167] New York's anti–SLAPP statute requires a plaintiff faced with a motion to dismiss or

---

[161] The Court notes that the parties also disagree over the application of New York's anti–SLAPP law to the substantive issues in this case. For purposes of this decision, the Court considers only whether New York's anti-SLAPP law applies at the pleading stage.
[162] *See generally Agar v. Judy*, 151 A.3d 456, 470–72 (Del. Ch. 2017).
[163] *Id.* at 471 (internal quotation marks omitted).
[164] N.Y. Civ. Rights Law § 76(a) (McKinney's 2020); 10 Del. C. §§ 8136-38 (2020).
[165] N.Y. Civ. Rights Law §§ 76–a(1)(a) (McKinney's 2020).
[166] *See, e.g.*, *Mable Assets, LLC v. Rachmanov*, 146 N.Y.S.3d 147, 149–50 (N.Y. App. Div. 2021).
[167] N.Y. Civ. Rights Law § 76–a(1)(d).

motion for summary judgment to demonstrate the case "has a substantial basis in law or is supported by a substantial argument for an extension, modification, or reversal of existing law."[168] When assessing a motion to dismiss, the Court determines whether it is possible that the plaintiff will ultimately prove defamation "by clear and convincing evidence."[169]

Fox and Dominion debate whether New York or Delaware procedural law applies to the Motion. At this stage, the parties suggest the difference between Delaware and New York procedural law could affect (i) the type and scope of documents the Court may consider in resolving the Motion; and (ii) the level of scrutiny applied to Dominion's allegations.

Fox contends "New York's anti-SLAPP pleading standard applies [and] . . . requires consideration of 'affidavits' at the pleadings stage."[170] Fox elsewhere has argued that this requirement "is inseparably interwoven with [Fox's] substantive rights."[171] Fox asserts that the Court must apply a "heightened standard" that requires Dominion's allegations to have a "substantial basis in law" to survive dismissal because New York's pleading rules are substantive under the circumstances here.[172] Dominion, in opposition, asserts New York's affidavit and substantial basis rules are "purely procedural, and so do not apply here."[173]

---

[168] *Id.* § 70–a(1)(a).

[169] *Id.* § 76–a(2).

[170] D.I. 48; Def.'s Opening Br. in Supp. of Mot. to Dismiss Pl.'s Compl. at 5 n.1 (hereinafter "Fox Opening Br.") (quoting N.Y. C.P.L.R. § 3211(g)(2)). The N.Y. C.P.L.R. is New York's equivalent of this Court's Civil Rules of Procedure.

[171] D.I. 38, Def.'s Mot. to Apply New York's Anti-SLAPP Law at 3 (internal quotation marks omitted) (hereinafter "Fox CPLR Br.")

[172] Fox Opening Br. at 14–15; *but see id.* at 14 (arguing Dominion "fail[s] to state a claim under any applicable pleading standard"); D.I. 61, Def.'s Reply Br. in Supp. of Mot. to Dismiss Pl.'s Compl. at 4 (hereinafter "Fox Reply Br.") ("The Court should dismiss Dominion's complaint, regardless of which pleading standard applies.").

[173] D.I. 60, Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss at 7 (hereinafter "Dominion Br.") (citation omitted); *see also* D.I. 43, Pl.'s Resp. in Opp. to Def.'s Mot. to Apply New York's Anti-SLAPP Law at 3–6 (arguing no court outside New York has applied N.Y. C.P.L.R. in this context).

New York law governs the substantive issues raised by Dominion's tort allegations.[174] "As a general rule," however, "the law of the forum governs procedural matters."[175] As a result, "[t]he local law of the forum governs rules of pleading."[176] As such, Delaware law presumptively governs "pre-trial practice" and "motions."[177] Unless an exception applies, therefore, the Court must apply Delaware procedural law to the Motion. Fox contends an exception applies.

Relying on the "foreign procedural law exception," Fox argues New York's procedural rules function in the context of anti-SLAPP lawsuits as rules that affect a defamation defendant's substantive rights. Fox identifies, as the substantive right, the right to have a lawsuit that could chill free speech scrutinized closely and decided efficiently at the pleadings stage of the case.[178]

Under the foreign procedural law exception, foreign procedural law governs if it is "so inseparably interwoven with substantive rights" that application of Delaware procedural law would "deprive[]" those substantive rights.[179] "[T]he test 'is not whether the rule *affects* a litigant's substantive rights; most procedural rules do.'"[180] Instead, when a party claims application of Delaware procedural law would deprive its substantive rights, courts must determine whether the foreign procedural rule "constitutes or is vitally bound up with…the

---

[174] *See* D.I. 40, Order Designating New York Law and Waiving *Forum Non Conveniens*.
[175] *Chaplake Holdings, Ltd. v. Chrysler Corp.*, 766 A.2d 1, 5 (Del. 2001); *accord Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 987 (Del. 2013); *see also Meyers v. Intel Corp.*, 2015 WL 227824, at *3 (Del. Super. Jan. 15, 2015); *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, 1994 WL728816, at *3–5 (Del. Ch. Dec. 16, 1994); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1993 WL 563244, at *3 (Del. Super. Dec. 21, 1993). In the remedies context, the procedural law of the forum yields to foreign procedural law where the question of remedy is bound closely to the applicable substantive rule. *See generally Naughty Monkey LLC v. Marinemax Ne. LLC*, 2010 WL 5545409, at *8 n.59 (Del. Ch. Dec. 23, 2010) (summarizing applicable principles and collecting authority).
[176] *See* Restatement (Second) of Conflict of Laws § 127 (1971).
[177] *Id.* cmt. a.
[178] *See* Fox CPLR Br. at 9–10. Fox also identifies different substantive rights for different contexts, including burdens of proof, discovery, evidence, and attorney's fees. *See id.* at 5–8.
[179] *Chaplake*, 766 A.2d at 5 (internal quotation marks omitted).
[180] *Mergenthaler v. Triumph Mortg. Corp.*, 2018 WL 6177177, at *8 (Del. Super. Nov. 26, 2018) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010)).

asserted substantive right."[181]  In practice, this Court has applied foreign procedural law as if it were substantive law where failure to do so would be outcome-determinative.[182]

The Court does not find Fox's posited "right" to a pleadings-stage standard of review to be substantive.  A procedural rule that purportedly "codifies common law" doctrines, like defamation defenses, is not automatically substantive.[183]  Standards of review are "consistently classified" as "procedural . . . for choice-of-law purposes."[184]  As a result, Fox's "right" to have a motion to dismiss resolved in a certain way is, if anything, a procedural "right."[185]

Nevertheless, assuming there is a substantive right to "close scrutiny and efficient resolution" of a motion to dismiss, Delaware procedural law does not deprive Fox of that right.  At the pleadings stage, federal courts in New York have observed the "substantial basis in law" standard does not govern whether a claim should be dismissed.  To the contrary, federal courts have held a claim may be dismissed even if it has a substantial basis in law.[186]  Citing New York cases and cases from the Court of Chancery, federal courts in New York have concluded the

---

[181] *El Paso*, 1994 WL 728816, at *4; *accord Meyers*, 2015 WL 227824, at *3.

[182] *See Meyers*, 2015 WL 227824, at *4; *see also Mergenthaler*, 2018 WL 6177177, at *8 ("If a rule . . . alters the rules of decision by which the court will adjudicate [a party's] rights, it is substantive." (internal quotation marks omitted)).

[183] *See MPEG LA, L.L.C. v. Dell Glob. B.V.*, 2013 WL 812489, at *6–7 & n.30 (Del. Ch. Mar. 6, 2013).

[184] Restatement (Second) of Conflict of Laws § 122 cmt. a; *see, e.g.*, *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1288 (Del. 2007) (finding inadequate notice before converting a motion to dismiss into a motion for summary judgment violates procedural rights).

[185] *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1092 (Del. 2001) (observing the scope of documents the court may consider at the motion to dismiss stage involves procedural rights); *see also Erickson v. Centennial Beauregard Cellular LLC*, 2003 WL 23190390, at *1 (Del. Ch. Dec. 31, 2003) (finding class certification issue "raised a procedural right, not a substantive right").

[186] *E.g.*, *Egiazaryan v. Zalmayev*, 2014 WL 1244790, at *5 (S.D.N.Y. Mar. 19, 2014) ("The 'substantial basis in fact and law' standard is distinct from the standard to grant dismissal for failure to state a claim under Rule 12(b)(6), which requires a plaintiff to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *Friends of Rockland Shelter Animals, Inc. v. Mullen*, 313 F. Supp. 2d 339, 344–45 (S.D.N.Y. 2004).  As an analogy, this rule captures the situation where a plaintiff files a well-pleaded, but untimely, contract claim.  The claim itself has a substantial basis in law—it meets the elements and so is not frivolous—but cannot state plausible or possible relief because the statute of limitations bars it.

substantial basis in law standard simply asks whether a claim is frivolous or not.[187]  The standard does not ask whether a claim is plausible or possible.  Here, the question of whether Dominion's allegations are reasonably conceivable necessarily involves an analysis of whether Dominion's allegations are frivolous.  As such, the Court finds that there are no outcome-determinative concerns.

Moreover, Fox's efficiency-based substantive "right" counsels against applying New York procedural law.  Application of foreign procedural law is "often difficult and disruptive" and undermines the forum state's "judicial machinery…and how its court processes are administered."[188]  In contrast, applying Delaware procedural law is straightforward and so would advance "the values" of time and rigor Fox believes New York procedural law promotes.[189]

Delaware courts, in analyzing Delaware's analogous anti-SLAPP statute, have observed the "clear and convincing" requirement as more demanding than Delaware's generic dismissal standard.[190]  But the cases that have done so were applying Delaware substantive law, and so did not pass on whether that standard is applicable when Delaware procedural law governs.  Moreover, as a statutory matter, the clear and convincing standard appears only to apply to the plaintiff's ultimate burden of proof.

In addition, Fox does not argue for a clear and convincing standard at this stage.[191]  Therefore, the relevant question at this stage is whether, based on Dominion's present allegations, it is reasonably conceivable that Dominion will establish actual malice by clear and

---

[187] *See Egiazaryan*, 2014 WL 1244790, at *3–5 (articulating conclusion and citing, among other decisions, *Conesco Indus. Ltd. v. St. Paul Fire & Marine Ins. Co.*, 210 A.D.2d 596, 599 (N.Y. App. Div. 1994) and *Nichols v. Lewis*, 2008 WL 2253192, at *6 (Del. Ch. May 29, 2008)).

[188] *MPEG LA*, 2013 WL 812489, at *3 (internal quotation marks omitted).

[189] *Id.* (internal quotation marks omitted).

[190] *See Agar*, 151 A.3d at 471–72.

[191] *But see* Fox Reply Br. at 4 ("The Court should dismiss Dominion's complaint, regardless of which pleading standard applies.").

convincing evidence at trial. Accordingly, Delaware's pleading standard would not affect Fox's substantive rights by changing the outcome it might obtain if New York procedural law were applied at the pleadings stage.[192]

Fox also asserts that it would be deprived of a substantive right if the Court declined to consider the Motion's affidavits at the pleadings stage. The Court disagrees and finds that Fox's additional argument does not support application of New York procedural law.[193]

The Court notes that, in general, a mere difference between Delaware and a foreign state on pleading requirements does not mean the difference is substantive.[194] When reviewing the papers, the Court has observed that the Motion's affidavits are used to establish what appear to be affirmative defenses. Delaware and New York courts generally do not use affirmative defenses as a basis for dismissing claims at the pleading stage.[195] That is especially true when an affirmative defense has not yet been pleaded. Under New York law, Fox could not use its affidavits to establish an affirmative defense of truth or privilege to a defamation action before it had pleaded that defense in an answer.[196] Given this, and that the affidavits are preserved for and available for use in, for example, a summary judgment motion, the Court finds that Fox has not been deprived of a substantive right by applying Delaware's pleading rules to the Motion.[197]

For the foregoing reasons, the Court will apply Delaware procedural law to the Motion.

---

[192] As discussed below, even applying a clear and convincing standard at this stage of the proceedings, the Court would find that the Complaint states claims upon which relief can be granted. The Complaint and its exhibits are detailed, cite to specific conduct and factually support every element of the claims asserted.

[193] That is not to say these documents will not be considered at a later stage in the case (*e.g.*, summary judgment, trial).

[194] *See Meyers*, 2015 WL 227824, at *4 (holding difference between Delaware and Colorado rules for pleading "exemplary damages" did not affect a substantive right and applying Delaware law).

[195] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2004); *Baines v. Daily News L.P.*, 26 N.Y.S.3d 658, 664 (N.Y. Sup. Ct. 2015).

[196] *Baines*, 26 N.Y.S.3d at 664.

[197] *See id.* ("To allow defendants to raise truth or privilege in a pre-answer motion to dismiss a complaint for failure to state a claim [impermissibly] would necessitate that the complaint . . . anticipate and address an affirmative defense before it has been pleaded. [D]efendants must raise these affirmative defenses in an answer and move for summary judgment . . . ." (citations omitted)).

**B. DELAWARE'S MOTION TO DISMISS STANDARD.**

A party may move to dismiss under this Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[198]  In considering a Rule 12(b)(6) motion, the Court (i) accepts as true all well-pleaded factual allegations in the complaint; (ii) credits vague allegations if they give the opposing party notice of the claim; (iii) draws all reasonable factual inferences in favor of the non-moving party; and (iv) denies dismissal if recovery on the claim is reasonably conceivable.[199]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[200]

Delaware's pleading standard is "minimal."[201] Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[202]

In general, a claim's reasonable conceivability cannot be determined through "matters outside the pleadings."[203]  But, "for carefully limited purposes,"[204] the Court may consider "matters outside the pleadings when the document is integral to . . . a claim and incorporated into the complaint."[205]  "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[206]

---

[198] Del. Super. Civ. R. 12(b)(6).

[199] *Cent. Mortg. Co.*, 27 A.3d 531 at 535.

[200] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[201] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).

[202] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility. . . .'").

[203] *Windsor I, LLC v. CWCapital Asset Mgmt LLC*, 238 A.3d 863, 872-75 (Del. 2020); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995).

[204] *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 69.

[205] *Windsor I, LLC*, 238 A.3d at 873 (internal quotation marks omitted).

[206] *Malpiede*, 780 A.2d at 1083.

As discussed below, the Court finds that the Complaint is not conclusory. Dominion pleads specific facts that put Fox on notice as to Dominion's claims. The Complaint, and its exhibits, are detailed and focused, and state a reasonably conceivable defamation *per se* claim.

## V.      DISCUSSION

To state a claim for defamation *per se* under New York law, a plaintiff must establish (i) a false statement; (ii) publication; (iii) fault; and (iv) one of four *per se* injuries, including, as relevant here, (a) an accusation of a serious crime or (b) business harm.[207]  In addition, the alleged defamation must be "of or concerning the plaintiff."[208]  The Motion seeks dismissal based on three affirmative defenses that purportedly apply regardless of whether a statement made is defamatory. In other words, Fox contends Dominion fails to state a defamation claim because three privileges mandate dismissal even if the Court accepts Dominion's allegations as true.

The Court has reviewed the Complaint and its exhibits. The Complaint is detailed and specific and addresses each element of the claim. The Complaint provides ample notice as to the basis of Dominion's claims against Fox. For the reasons discussed below, the Court finds that none of Fox's arguments mandate dismissal under Civil Rule 12(b). Accordingly, the Court is denying the Motion.

### A.  FOX'S UNPLED DEFENSES ARE NOT "WELL-SUITED FOR TREATMENT" ON A MOTION TO DISMISS.

Apart from the actual malice requirement, Fox does not appear to argue Dominion's allegations are conclusory. Instead, the Motion seemingly attempts to introduce affirmative defenses Fox intends to raise if this case proceeds beyond the pleadings stage. These defenses

---

[207] *Kasavana v. Vela*, 100 N.Y.S.3d 82, 85–86 (N.Y. App. Div. 2019).
[208] *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (N.Y. App. Div. 1994) (quoting *Gross v. Cantor*, 200 N.E. 592, 593 (N.Y. 1936)).

are not pleaded, however, because Fox has not yet answered the Complaint. As a result, the defenses are based, in large part, on facts outside the Complaint.

At this stage, the Court usually does not consider facts outside the Complaint. "The complaint generally defines the universe of facts that the trial court may consider in ruling on a Rule 12(b)(6) motion to dismiss."[209] As such, "[m]atters extrinsic to a complaint generally may not be considered in a ruling on a motion to dismiss."[210] Given these constraints on the Court's view of the evidence, the non-movant's "affirmative defenses . . . are not ordinarily well-suited for treatment on" a motion to dismiss.[211] The Court should not dismiss a complaint due to an affirmative defense "[u]nless *it is clear from the face of the complaint that an affirmative defense exists* and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense."[212]

Delaware courts considering defamation claims on a motion to dismiss have been wary of granting dismissal based on affirmative defenses, including on the privileges Fox invokes here.[213] As a matter of Delaware procedural law, the question of

> Privilege…depend[s] upon the facts and circumstances surrounding the making of the publication. Since it is a matter of affirmative defense[,] it may not be raised by a motion to dismiss under Rule 12(b)(6) but should be made a matter of answer supported by proof at trial.[214]

The Court, noting a "low pleading threshold," has denied dismissal of defamation claims where "additional facts developed in discovery will reveal [whether] the alleged defamatory statements

---

[209] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[210] *AlixPartners, LLP v. Mori*, 2019 WL 6327325, at *15 (Del. Ch. Nov. 26, 2019) (internal quotation marks omitted).

[211] *Reid*, 970 A.2d at 183; *accord Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *13 (Del. Ch. Aug. 27, 2018); *see also In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *12 (Del. Ch. Dec. 20, 2013).

[212] *Reid*, 970 A.2d at 183–84 (emphasis added).

[213] *See, e.g.*, *Kelly v. Blum*, 2010 WL 629850, at *16–17 (Del. Ch. Feb. 24, 2010).

[214] *Klein v. Sunbeam Corp.*, 94 A.2d 385, 392 (Del. 1952); *accord Meades v. Wilmington Hous. Auth.*, 2005 WL 1131112, at *2 n.15 (Del. Super. May 12, 2005).

were true, mere expressions of opinion, or…protected by an applicable privilege."[215]  Expressed differently, "even silly or trivial [defamation] claims can easily survive a motion to dismiss where the plaintiff pleads facts that put the defendant on notice of his claim, however vague or lacking in detail these allegations may be."[216]

The Court, applying Delaware procedural law, will use these legal principles when addressing the Motion's arguments.  The Court will not deny the Motion solely because it raises affirmative defenses based on facts outside the pleadings; however, a finding that Dominion's allegations state a reasonably conceivable defamation claim will defeat the Motion to the extent the Motion is based on unpled and fact-based affirmative defenses that could be raised later in the case.

**B. PROCEDURAL LIMITATIONS ASIDE, FOX'S DEFENSES DO NOT SUPPORT DISMISSAL.**

Through the Motion, Fox raises three "defenses" to Dominion's allegations: (i) the "neutral reportage" defense; (ii) the "fair report" privilege; and (iii) the defense of opinion.  For the reasons set forth below, the Court finds these defenses either are not applicable, or, if applicable, rest on factual issues inappropriate for resolution at this stage in the proceedings.

**1. The "Neutral Reportage" Defense Does Not Support Dismissal.**

Fox invokes the neutral reportage privilege—also characterized as the neutral reportage doctrine.  Fox argues that it was free to broadcast, without liability, allegations made against Dominion by the Trump Campaign and its attorneys on a matter of public concern.

The neutral reportage defense bars recovery for defamation when the challenged statements, even if defamatory, are "newsworthy."[217]  Under the neutral reportage doctrine, the

---

[215] *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *10 (Del. Super. June 6, 2012).
[216] *Doe v. Cahill*, 884 A.2d 451, 459 (Del. 2005).
[217] *See Edwards v. Nat'l Audobon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977) (articulating doctrine).

press need not "suppress newsworthy statements merely because it has serious doubts regarding their truth."[218]  Instead, under the doctrine, the press enjoys "immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made."[219]

The neutral reportage defense was developed by a federal court of appeals; however, the defense seems to run contrary to United States Supreme Court precedent as it seems to create a nearly unqualified privilege.[220]  The United States Supreme Court has attempted to strike a balance between First Amendment freedoms and viable claims for defamation.  In doing so, the United States Supreme Court has declined to endorse *per se* protected categories like newsworthiness.  Instead, the determination of how much protection should be afforded the media has been left to the states.[221]

One of New York's intermediate appellate courts, the Appellate Division, Fourth Department, recognized the tension between the neutral reportage doctrine and binding First Amendment precedent.  In *Hogan v. Herald Co.*, the Appellate Division determined the neutral report doctrine could not be reconciled with binding free speech precedent.[222]  As a result, the Appellate Division held the neutral reportage doctrine inapplicable under New York law.[223]  The New York Court of Appeals affirmed *Hogan*.[224]  Since then, the New York Court of Appeals has restated its rejection of the neutral reportage doctrine.[225]  Given this New York precedent, the

---

[218] *Id.*
[219] *Id.*
[220] *See Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 68–69 (2d Cir. 1980) (questioning and limiting the reach of the neutral reportage doctrine).
[221] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *see also Times, Inc. v. Firestone*, 424 U.S. 448, 456 (1976).
[222] 84 A.D.2d 470, 477–79 (N.Y. App. Div. 1982), *aff'd*, 444 N.E.2d 1002 (N.Y. 1982).
[223] *Id.* at 479.
[224] 444 N.E.2d 1002.
[225] *Weiner v. Doubleday & Co., Inc.*, 549 N.E.2d 453, 456 (N.Y. 1989); *see also Huggins v. Moore*, 726 N.E.2d 456, 462 (N.Y. 1999) (citing *Hogan* in finding issue of journalistic liability was a fact question).

Court questions whether Fox can raise neutral reportage doctrine or analogous newsworthiness privilege as an absolute defense to liability for defamation under New York law.

Fox attempts to distinguish *Hogan* on its facts, arguing *Hogan* rejected the neutral reportage doctrine in the context of "private figure" plaintiffs. As an initial matter, the parties do not discuss whether Dominion is a public or private figure, making this distinction not relevant at this time.[226] Fox's argument, however, fails even if the neutral reportage defense only had been rejected as to private figure plaintiffs.[227] Just because the neutral reportage privilege may have been denied in the context of private figure plaintiffs does not mean, by inference, the defense is available against public figure plaintiffs. Indeed, New York subjects public figure plaintiffs to the actual malice standard, not to a newsworthiness test.[228] The actual malice standard also is the standard under New York's anti–SLAPP statute (if applicable).[229] Fox's private figure argument, at most, reveals New York law has not spoken directly on the issue. It does not establish a neutral reportage defense as a matter of New York law.

The neutral reportage defense would not warrant dismissal here even if the defense were available. To assert and benefit from this defense, a defendant must show that the defendant accurately and dispassionately reported the newsworthy event.[230] As such, Fox's reporting must have been neutral, not "a personal attack" on Dominion, to succeed on this defense.[231]

---

[226] *See Gottwald v. Sebert*, 148 N.Y.S.3d 37, 43–45 (N.Y. App. Div. 2021) (summarizing and applying applicable principles).

[227] The Court notes that, in the absence of the neutral reportage defense, defendants alleged to have defamed private figures in the context of matters of public concern are afforded a "gross irresponsibility defense," and not a complete shield from liability. *E.g.*, *Chapadeau v. Utica Observer–Dispatch*, 341 N.E.2d 569, 571 (N.Y. 1975); *accord Weiner*, 549 N.E.2d at 595; *see generally Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 105 n.11 (2d Cir. 2000).

[228] *E.g.*, *Curry v. Roman*, 635 N.Y.S.2d 391, 395 (N.Y. App. Div. 1995).

[229] N.Y. Civ. Rights Law § 76–a(2).

[230] *See Edwards*, 556 F.2d at 120.

[231] *Id.*

Dominion's well-pleaded allegations, however, support the reasonable inference that Fox's reporting was not accurate or dispassionate.

The Court, reviewing the Complaint's allegations, notes that it is reasonably conceivable that Fox's reporting was inaccurate. As alleged, Dominion attempted to factually address Fox's election fraud allegations. After Fox began connecting Dominion to election fraud claims, Dominion sent Fox executives and television anchors its "SETTING THE RECORD STRAIGHT" emails. Dominion's emails, which contained analysis from election and related experts, tended to disprove the election fraud claims. Nevertheless, Fox and its news personnel continued to report Dominion purported connection to the election fraud claims without also reporting on Dominion's emails. When Fox guests spread or reiterated disinformation about Dominion, Fox did not use the information Dominion provided to correct its guests or to reorient its viewers. Instead, Fox and its personnel pressed their view that considerable evidence connected Dominion to an illegal election fraud conspiracy.

In addition, the Court notes that it is reasonably conceivable that Fox was not dispassionate. Given that Fox apparently refused to report contrary evidence, including evidence from the Department of Justice, the Complaint's allegations support the reasonable inference that Fox intended to keep Dominion's side of the story out of the narrative. Moreover, the Complaint alleges numerous instances in which Fox personnel did not merely ask questions and parrot responses but, rather, endorsed or suggested answers. Fox therefore may have failed to report the issue truthfully or dispassionately by skewing questioning and approving responses in a way that fit or promoted a narrative in which Dominion committed election fraud.

43

The Court is not persuaded by Fox's two counterarguments. First, Fox argues it was not required to "defend" Dominion from Fox's guest by reporting Dominion's refutations.[232] Still, Fox's possession of evidence demonstrating the election fraud claims were untrue supports the reasonable inference that Fox made or published statements knowing they were false or with a reckless disregard for the truth.[233] Fox may not ordinarily have a duty to defend the targets of allegations on which it is reporting; however, Fox must report on those allegations accurately and dispassionately under the neutral reportage defense. Second, Fox argues there are instances in which Fox was critical of the allegations against Dominion and in which Fox reported Dominion's refutations. Fox may end up being right. This is the pleadings stage though and, at this stage, this argument raises factual issues the Court must resolve in Dominion's favor. Fox will have the ability to develop this argument during discovery as the case proceeds.

The neutral reportage defense does not apply when the press "espouses or concurs in the charges made by others[] or who deliberately distorts these statements to launch a personal attack" on the plaintiff.[234] The Complaint's allegations support the reasonable inference that Fox did both. Accordingly, at the pleadings stage, Dominion's allegations support the reasonable inference that Fox was not engaged in neutral reportage.

### 2. The "Fair Report" Privilege Does Not Support Dismissal.

Fox next asserts the "fair report privilege." New York has codified the fair report privilege in Section 74 of the Civil Rights Law.[235] Section 74 provides that a "civil action cannot be maintained….for the publication of a fair and true report of any judicial proceeding,

---

[232] Fox Reply Br. at 13–14.
[233] *See infra* Section V.C.
[234] *Id.*
[235] *See Holy Spirit Ass'n for Unif. of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979)

44

legislative proceeding or other official proceeding."[236]  Thus, for the privilege to apply, a

publication must be a "fair and true report" "of" an official proceeding.  The Court finds that the

Complaint's well-pleaded allegations support the reasonable inference that Fox's reporting (i)

was not fair or true and (ii) did not concern an official proceeding.

For the fair report privilege to apply, Fox's report of election fraud litigation and

investigation must be "substantially accurate." [237]  A report is substantially accurate when "it

does not produce a different effect on a reader than would a report containing the precise truth,"

even if it contains minor inaccuracies.[238]  In determining whether a report is substantially

accurate, New York courts analyze the publication as a whole, rather than individual statements

within the larger publication separately. [239]  New York courts consider the publication's "effect

upon the average reader" when analyzing the publication as a whole.[240]

By statute, the fair and true report must be "of . . . proceedings."  Under New York law,

statutory terms are construed according to their ordinary meaning.[241]  In this context, the word

"of" most naturally means "about," "relating to," and "in respect to."[242]  Given that plain

meaning, New York decisions hold that the fair report privilege is not triggered unless the report

"comment[s] on a . . . proceeding."[243]  Given that requirement, New York decisions teach that a

report cannot be "of" a proceeding unless the subject proceeding has been initiated and is

---

[236] N.Y. Civ. Rights Law § 74.

[237] *Alf v. Buffalo News, Inc.*, 995 N.E.2d 168, 169 (N.Y. 2013).

[238] *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017) (citing *Karades v. Ackerley Grp. Inc.*, 423 F.3d 107, 119 (2d Cir. 2005)) (applying N.Y. Civ. Rights Law § 74).

[239] *Id.*; *James v. Gannett Co., Inc.*, 353 N.E.2d 834, 838 (N.Y. 1976).

[240] *James*, 353 N.E.2d at 838.

[241] *E.g.*, *In re Grand Jury Subpoena Duces Tecum Served on Museum of Mod. Art*, 719 N.E.2d 897, 905 (N.Y. 1999); *Raritan Dev. Corp. v. Silva*, 689 N.E.2d 1373, 1377 (N.Y. 1997).

[242] *Of*, Merriam-Webster (online ed.), www.merriam-webster.com/dictionary/of (last visited Aug. 24, 2021).

[243] *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (N.Y. App. Div. 2009).

pending or ongoing.[244]  Doubt regarding whether the report is "of" a proceeding is resolved

against the privilege.[245]  Moreover, Section 74 does not shield defamatory statements merely

because a party has started judicial proceedings incorporating those statements.[246]

The Court recognizes that most of the alleged statements were made before a lawsuit had

been filed (*e.g.*, the Powell allegations).  As a result, most of the alleged statements, even if true,

were not "of" a judicial proceeding.  That alone is enough to preclude the fair report privilege.

Fox counters with decisions that, according to Fox, hold the fair report privilege applies to

"anticipated" or "forthcoming" lawsuits as well as pending proceedings.[247]  To the extent Fox

argues its personnel were referring to pending election fraud cases filed throughout the nation,

and investigations initiated by the federal government, the Complaint alleges facts that Fox's

personnel did not tailor their comments to the allegations in those proceedings.  By consequence,

the Court finds there is ambiguity, from the viewer's perspective, as to whether Fox was

reporting on those proceedings.

---

[244] *E.g.*, *Dimond v. Time Warner, Inc.*, 119 A.D.3d 1331, 1332 (N.Y. App. Div. 2014); *Russian Am. Found., Inc. v. Daily News, L.P.*, 109 A.D.3d 410, 412–13 (N.Y. App. Div. 2013); *McRedmond v. Sutton Place Rest. & Bar, Inc.*, 48 A.D.3d 258, 259 (N.Y. App. Div. 2008); *Lacher v. Engel*, 33 A.D.3d 10, 17 (N.Y. App. Div. 2006); *Fishof v. Abady*, 280 A.D.2d 417, 417 (N.Y. App. Div. 2001); *Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 620 (N.Y. App. Div. 1994); *McNally v. Yarnall*, 764 F. Supp. 853, 855 (S.D.N.Y. 1991); *Branca v. Mayesh*, 101 A.D.2d 872, 873–74 (N.Y. App. Div. 1984).

[245] *E.g.*, *Cholowsky*, 69 A.D.3d at 114–15 ("If the context in which the statements are made make it impossible for the ordinary viewer [listener or reader] to determine whether defendant was reporting on a judicial proceeding, the absolute privilege does not apply." (alteration in original) (internal quotation marks omitted))).

[246] *See Williams v. Williams*, 246 N.E.2d 333, 337 (N.Y. 1969) ("We conclude that it was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute").

[247] *But see supra* note 244.  The parties discuss one of these decisions, *Hudson v. Goldman Sachs & Co.*, 304 A.D.2d 315 (N.Y. App. Div. 2003), in some detail.  *Hudson* appears to support the formal proceeding requirement. *Hudson* explained that "Section 74 [allows] . . . a person served with a *summons and complaint* . . . to announce its position" free of liability if that position is substantially accurate.  *Id.* at 316 (emphasis added).  To the extent the decision suggests otherwise, that appears to be due to its unusual procedural posture.  At a prior time in the case, the Appellate Division did not have the defendant's "pleading" and so could not confirm whether the its position was substantially accurate in comparison to the underlying newspaper article.  *Id.* at 315–16.  So the court remanded for production of that document to settle a "premature" dispute (*i.e.*, an anticipated, rather than formalized, proceeding). *Id.* at 316.

Similarly, Fox's report may not have been substantially accurate. At various times, Fox published statements made by guests who stated their allegations were supported by evidence. The Complaint, however, alleges that none of these sources adduced any evidence for these allegations. Fox and its personnel continued, on television and through social media, to perpetuate the narrative that forthcoming lawsuits would expose Dominion's election fraud. In addition, Fox allegedly mischaracterized those allegations on several occasions (*e.g.*, comments reporting that the lawsuits involved "kickbacks"). At this point in the proceedings, the Complaint alleges that Fox's statements evince a substantial deviation from those proceedings' alleged facts.

In reference to the whole publication's effect on the average viewer, the Complaint supports a reasonable inference that Fox repeatedly misstated election fraud allegations to defame Dominion. Because, at this stage, Fox's statements might not amount to a fair and true report of official proceedings, the Motion is denied to the extent it is based on the fair report privilege.

### 3. The Opinion Defense Does Not Support Dismissal.

Fox's final defense concerns the opinion vs. fact distinction—the opinion defense. Fox argues that any defamatory statements made by its news personnel were pure opinion and, therefore, are not actionable. The opinion defense, however, is fact-based. Accepting Dominion's allegations as true, Fox's statements were not opinions. So factual issues regarding whether a reasonable listener would consider Fox's statements to be opinion or fact preclude dismissal.

"Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, only statements alleging facts can properly be the subject of a

defamation action."[248] In contrast, "pure opinions" are not actionable.[249] In New York, the

difference is a question of law.[250] To ascertain the difference between a pure opinion and a

statement of fact, New York courts have articulated a three-factor test:

> (1) whether the specific language in issue has a precise meaning [that] is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether the full context of the communication in which the statement appears . . . signal[s to] readers or listeners that what is being read or heard likely to opinion, not fact.[251]

An "opinion" is actionable if a "reasonable listener" would find the speaker conveyed facts about

the plaintiff.[252] So "[t[he key inquiry is whether [the] challenged expression, however labeled by

defendant, would reasonably appear to state or imply assertions of objective fact."[253]

> In making this inquiry, courts cannot stop at literalism. The literal words of challenged statements do not entitle a media defendant to "opinion" immunity or a libel plaintiff to go forward with its action. In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person.[254]

Here, the Complaint supports the reasonable inference that Fox was reporting on a fact,

*i.e.*, that Dominion aided or caused election fraud. Fox's news personnel repeatedly framed the

issue as one of truth-seeking and purported to ground interview questions in judicial proceedings

and evidence. Reviewing the Complaint, the Court does not read Fox's statements as mere

statements of opinion. That said, a line-by-line assessment of whether each commentator's

"opinion" is a provably false statement of fact is unnecessary at this stage. Although it seems

Fox was stating facts, not opinions, the presence of a "reasonable listener" requirement cautions

---

[248] *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014) (alteration and internal quotation marks omitted).
[249] *Id.*
[250] *Id.*
[251] *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995) (alteration and internal quotation marks omitted).
[252] *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 934 (N.Y. 1992).
[253] *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991).
[254] *Id.* at 1273–74.

against an interpretation at the pleadings stage.[255]  It is sufficient, at this stage, to hold that the Complaint states a reasonably conceivable defamation claim based on what a reasonable listener could conclude are false statements of fact and defer the question to a fact finder.

Moreover, the Court finds it reasonably conceivable that Fox's reporting comprised opinion "mixed" with false facts.  Under New York law, "mixed opinions" are actionable.[256]  Mixed opinions are defined in contrast to pure opinions.  A pure opinion is defined, in part, as an expressed viewpoint that does not obscure or imply undisclosed facts.[257]  A mixed opinion "implies that it is based on facts which justify the opinion but are unknown to those reading or hearing it."[258]  So "[w]hat differentiates an actionable mixed opinion from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown to [the] audience, which support [the speaker's] opinion and are detrimental to the person being discussed."[259]   Still, even where the speaker discloses the facts underpinning its opinion, the opinion remains actionable if those facts are "incorrect or incomplete, or if [the speaker's] assessment of them is erroneous."[260]  Accordingly, to ascertain the difference between a pure and a mixed opinion, the Court must use the same reasonable listener standard and three-factor test noted above.[261]

For substantially the same reasons discussed above, the Court finds it is reasonably conceivable that Fox and its personnel broadcasted mixed opinions that were based on either false or incomplete facts unknown to the reasonable viewer.  Many of Fox's reporters made broad election fraud statements that did not disclose their sources clearly, or clearly connect their

---

[255] *See, e.g.*, *Silsdorf v. Levine*, 449 N.E.2d 716, 719 (N.Y. 1983) ("Initially, we note the well-established principle that it is for the court to decide whether the statements complained of are reasonably susceptible of a defamatory connotation, thus warranting submission of the issue to the trier of fact." (internal quotation marks omitted)).

[256] *Davis*, 22 N.E.3d at 1004.

[257] *Id.*

[258] *Id.*

[259] *Id.* (first alteration added) (internal quotation marks omitted).

[260] *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–19 (1990); *see also Von Gutfeld*, 603 N.E.2d at 934–38.

[261] *Id.* at 1004–05.

statements to the election fraud litigations. Although Fox classifies its reporters' remarks as "commentary" that used "loose and hyperbolic rhetoric" for entertainment value, even loose and hyperbolic language can be actionable if it rests on false statements of fact undisclosed to viewers.[262] Accordingly, the Complaint supports the reasonable inference that Fox made unprotected statements of fact that defamed Dominion. At this stage, Fox's arguments do not support dismissal.

## C. DOMINION HAS ADEQUATELY ALLEGED ACTUAL MALICE.

Fox argues Dominion's Complaint fails to adequately plead fault (*e.g.*, actual malice).[263] The Court does not agree. At this stage, the Court finds that the Complaint alleges facts that Fox made the challenged statements with knowledge of their falsity or with reckless disregard of their truth.

"'Actual malice' means that defendants published the false information about plaintiff 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"[264] To satisfy the reckless disregard standard, a plaintiff must show the defendant "entertained serious doubts as to the truth of [the] publication or . . . had a high degree of awareness [its] falsity."[265] The failure to investigate a statement's truth, standing alone, is not evidence of actual malice, "even if a prudent person would have investigated before publishing the statement."[266] But a speaker cannot "purposefully avoid[]" the truth and then claim ignorance.[267] If the plaintiff

---

[262] *See, e.g.*, *Milkovich*, 497 U.S. at 20.
[263] Actual malice is the most demanding fault standard. It is codified in New York's anti–SLAPP statute and generally applies when a public figure plaintiff sues in defamation for statements the defendant made on matters of public concern. Although the appropriate fault standard hinges on further development of the record, the parties accept that actual malice is the relevant standard for resolving the Motion.
[264] *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 647 N.E.2d 101, 104 (N.Y. 1995) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).
[265] *Id.* (alterations in original) (internal quotation marks omitted).
[266] *Id.*
[267] *Id.*

offers "some direct evidence" that the statement "was probably false," the Court can infer that the defendant "inten[ded] to avoid the truth."[268]  By statute, the plaintiff ultimately must prove actual malice with clear and convincing evidence.[269]

Contrary to Fox's contentions, the Complaint's allegations are not conclusory.  The Complaint supports the reasonable inference that Fox either (i) knew its statements about Dominion's role in election fraud were false or (ii) had a high degree of awareness that the statements were false.  For example, Fox possessed countervailing evidence of election fraud from the Department of Justice, election experts, and Dominion at the time it had been making its statements.  The fact that, despite this evidence, Fox continued to publish its allegations against Dominion, suggests Fox knew the allegations were probably false.

In addition, the Complaint alleges that several of Fox's personnel openly disclaimed the fraud claims as false.  Yet, certain Fox personnel (*e.g.*, Mr. Dobbs) continued to push the fraud claims.  The nearby presence of dissenting colleagues thus further suggests Fox, through personnel like Mr. Dobbs, was knowing or reckless in reporting the claims.

The Complaint also alleges facts that there were signs indicating the reports were false. From these, the Court can infer that Fox intended to avoid the truth.  Whether Dominion ultimately will prove Fox's actual malice by clear and convincing evidence is irrelevant on a motion to dismiss.  At this stage, it is reasonably conceivable that Dominion has a claim for defamation *per se*.  Accordingly, Fox's Motion should be denied.

---

[268] *Id.*

[269] N.Y. Civ. Rights Law § 70–a(2).

51

## VI. CONCLUSION

For the foregoing reasons, the Motion is **DENIED**.

The Court has identified two issues that need additional briefing and resolution. First, the Court needs additional briefing on whether New York's anti-SLAPP applies to this proceeding. Second, the Court needs additional briefing on whether Dominion qualifies as a "public" or "private" figure. The Court notes that resolution of these two issues is not determinative on whether the Complaint states a claim upon which relief can be granted. While the Court found that the Complaint should not be dismissed even if the anti-SLAPP statute applies and Dominion is characterized as a "public" figure, a decision on these issues should provide guidance to the parties at later stages of the case. The Court will hold a status conference to discuss additional briefing on these issues.

**IT IS SO ORDERED**

December 16, 2021
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress